**IN THE UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**IN RE: GASTON DESIREE MELON** **No. 5:13-bk-71096**
**Chapter 7**

**FIRST NATIONAL BANK, VINITA** **PLAINTIFFS**

**5:13-ap-07049**

**GASTON DESIREE MELON** **DEFENDANTS**

**OPINION AND ORDER**

Before the Court is a complaint objecting to dischargeability filed by First National Bank and Trust Co. of Vinita [First National]. In its complaint filed July 3, 2013, First National requested relief under 11 U.S.C. § 523(a)(2)(A) and (a)(6). The debtor, Gaston Melon [Melon], filed his answer on August 6, 2013. The Court held a trial on the complaint and answer on December 12, 2013, and at the conclusion of the trial the Court took the case under advisement. For the reasons stated below the Court denies the relief requested under § 523(a)(2)(A) and (a)(6).

## JURISDICTION

This Court has jurisdiction over this matter under 28 U.S.C. § 1334 and 28 U.S.C. § 157 and it is a core proceeding under U.S.C. § 157(b)(2)(I). The following order constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## FACTUAL BACKGROUND

Melon filed his voluntary chapter 7 individual petition on March 26, 2013. Prior to that time Melon was in the business of selling recreational vehicles [RVs] and operated under several different names, including Gaston Melon Enterprises, Inc. [GME] and Gaston Melon RV. Melon operated his business primarily in Springdale, Arkansas.

In 2009, Gaston Melon RV, which was solely owned by Melon, entered into a business loan agreement and floor plan financing arrangement with Great Southern Bank of Springfield, Missouri [GSB]. (Exs. 1-7.) Melon also personally guaranteed the debt of GME to GSB. All commercial security agreements executed from time to time between GME and GSB contained the following language referring to the collateral that secured the loans and advances of GSB:

> "All inventory held for sale or lease, raw materials, work in progress or materials used or consumed in my business. All equipment, including machinery, vehicles, furniture, fixtures, manufacturing, shop and office equipment, parts and tools . . . . All inventory, accounts receivable, equipment, furniture, fixtures, records and general intangibles wherever located . . . . This filing includes recreational vehicles or [sic] every type held for resale."

(Ex. 7, p. 1.)

GSB's lien on the inventory of Melon's business was sometimes referred to as a "blanket lien" and GSB had a blanket lien on all of the inventory of GME. According to employees or former employees of GSB, GSB secured its interest in the inventory based on the commercial security agreement. GSB then perfected its interest in the various RVs by taking possession of the title to those vehicles. GSB did not always submit the title to the state to record the bank as a lien holder on the title; it merely kept physical possession of the title and claimed its perfected security interest under UCC filings. GSB's perfected security interest in GME's inventory of recreational vehicles was reflected by the Arkansas UCC filings introduced as Exhibits 54-57. The UCC filings provided GSB with a lien on all inventory of GME, including a 2008 Travel Supreme RV [Travel Supreme], which is the collateral the parties placed into controversy in this case.

Melon also transacted business at the Grove Branch of First National, located in Grove, Oklahoma. According to First National's branch president, Becky Fields, the bank first extended a loan to Melon in 2008 and continued to do business with Melon in the following years. A summary of the relevant transactions, including the last four digits of the referenced documents, follows:

| | | |
|---|---|---|
| June 16, 2008 | **Consumer Promissory Note** *2379<br>Security Interest in 2006 Country Coach *5249 | $145,120.00 |
| August 13, 2008 | **Promissory Note** (Renewal of *2379) *5570<br>(Purpose: renewal and advance to purchase travel trailer) | $345,509.08 |
| August 13, 2008 | **Security Agreement**–2004 Newell Coach *1704 | |
| August 13, 2008 | **Secured Guaranty/Security Agreement**<br>(re: Note *5570) 2004 Newell Coach *1704 | $345,509.08 |
| February 18, 2009 | **Promissory Note** (Renewal of *5570) *6263 | $348,038.05 |
| May 4, 2009 | **Promissory Note** (Renewal of *6263) *6925 | $348,918.98 |
| May 4, 2009 | **Security Agreement**–2004 Newell Coach *1704<br>(REN under existing LEF dated 8/13/2008) | |
| July 7, 2009 | **Security Agreement**–2006 Coach *5241<br>(Purpose: to release 2004 Newell Coach *1704 and update collateral to 2006 Coach *5241) | |
| December 20, 2010‡ | **Security Agreement**–2008 Travel Supreme *1172<br>(Purpose: to release 2006 Coach *5241 and update collateral to 2008 Travel Supreme *1172) | |
| May 11, 2011 | **Security Agreement**–2008 Travel Supreme *1172<br>(Purpose: "THIS SECURITY AGREEMENT REPLACES THE PREVIOUS SECURITY AGREEMENT DATED 5/04/2009 TO REFLECT LEF DATED 5/11/11.") | |

‡ The security agreement was incorrectly dated May 4, 2009.

Prior to December 20, 2010, the Travel Supreme in which First National was taking a security interest had been secured by GSB under its blanket lien. According to Melon, based on Melon's agreement with First National and GSB, Melon requested GSB to release its interest in the Travel Supreme in exchange for a security interest in the 2006 Coach, and requested First National to release its interest in the 2006 Coach for a security interest in the Travel Supreme. The purpose of the swap, according to Melon, was so Melon could own the Travel Supreme as his personal RV. The incorrectly dated security

agreement, which was dated May 4, 2009, was actually signed on December 20, 2010, and the collateral swap took place on December 21, 2010. According to the security agreement, Melon represented that the Travel Supreme was free of encumbrances and that Melon would not permit the Travel Supreme to be levied upon, garnished, or attached, nor permit any other secured party to have a security interest in the Travel Supreme.[1]

After the swap, Melon received the title to the Travel Supreme from GSB on or about December 29, 2010. However, rather than providing the title to First National as he was required to do under the security agreement (Ex. 39), Melon took the Travel Supreme title to Decatur State Bank. Melon testified that Decatur State Bank had a lien on some real estate in Missouri that was owned by Melon and was requesting additional collateral from Melon until the bank received an appraisal of the property. Decatur State Bank perfected its security interest in the Travel Supreme on February 2, 2011, by placing itself as a lienholder on the title. It subsequently released its lien on the Travel Supreme on March 24, 2011, after it received the property appraisal. Melon testified that he had explained the necessity of the Decatur State Bank transaction to the loan officer at First

---

[1] Paragraph 3 of the security agreement states:
OWNERSHIP FREE OF ENCUMBRANCES. Except for the security interest granted by this Agreement or by a mortgage executed in connection with this Agreement, and except for any security interest previously disclosed in writing to Secured Party, Debtor now owns, or will use the proceeds of the advances secured by this Agreement to become the owner of the Collateral (or has rights in or the power to transfer the Collateral) free from any prior liens, security interests or encumbrances. Debtor warrants title to and will defend the Collateral against all claims and demands of persons claiming any interest in the Collateral adverse to Secured Party. Debtor will not permit any liens or security interests other than Secured Party's security interest to attach to any of the Collateral, and will not permit the Collateral to be levied upon, garnished or attached under any legal process, or permit any other thing to be done that may impair the value of the Collateral or the security interest granted to Secured Party by Debtor.

National when he initially arranged for the collateral swap.[2]

After Decatur State Bank released the lien on the Travel Supreme, Melon testified that he took the release to the First National branch in Grove, Oklahoma. He also testified that he never received the title back from Decatur State Bank because it was lost or misplaced and that he applied for a new title to the Travel Supreme from the state of Arkansas on May 4, 2011.[3] (Ex. 50.) However, prior to that application, Melon signed a floor plan advance request with GSB dated April 7, 2011. (Ex. 12.) The result of the floor plan request was that GSB advanced $252,000 to Melon and, again, placed the Travel Supreme under the cover of GSB's blanket lien.[4] On May 11, 2011, Melon executed the replacement security agreement with First National that replaced the previous security agreement that was signed on December 20, 2010, but errantly dated May 4, 2009. (Ex. 40.)

On May 24, 2011, due to irregular and delinquent payments from GME, GSB repossessed GME's inventory, including the Travel Supreme. GSB sold the Travel Supreme to McGaugh RV on August 15, 2011, for $102,460. (Ex. 19.) Curiously, at no time prior to the bankruptcy filing in March 2013 did Melon ever advise First National that the Travel Supreme had been repossessed by GSB. In fact, over a period of months *after* the repossession in May 2011, Melon was advising agents of First National that the RV was actually in Florida with his family and in need of repairs. Melon also continued to make some payments to First National Bank for the Travel Supreme after the

---

[2] First National did not rebut this allegation.

[3] The duplicate title was issued by the state of Arkansas on May 5, 2011, but was not received by First National reflecting its lien until October 11, 2011, long after the Travel Supreme would become (re)subject to GSB's blanket lien. The Court is unable to determine whether this delay was caused by additional requirements requested by the state of Arkansas or the various actions or inactions of Melon or First National.

[4] Melon claimed that he did not remember signing the advance request document and said that he never saw the document until after this bankruptcy case was filed.

repossession.

For its § 523(a)(2)(A) complaint, First National alleges that Melon induced the release of First National's security interest in the 2006 Coach on December 20, 2010, by the use of false representations, false pretenses, and actual fraud. For its § 523(a)(6) complaint, First National alleges that Melon "took" First National's "money giving rise to the Indebtedness"[5] and inflicted serious economic damage on First National by depriving First National of its security interest in the Travel Supreme.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### 11 U.S.C. § 523(a)(2)(A)

Section 523(a)(2)(A) states, in pertinent part that "[a] discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt . . . (2) for money, property, services, or an extension renewal or refinancing of credit, to the extent obtained by–(A) false pretenses, a false representation, or actual fraud . . . . " 11 U.S.C. § 523(a)(2)(A). Under this section, in order to prevail, the plaintiff must prove by a preponderance of the evidence the following:

1. that the debtor made a representation;
2. that at the time the debtor knew that the representation was false;
3. that the debtor made the representation deliberately and intentionally with the intention and purpose of deceiving the creditor;
4. that the creditor justifiably relied on such representation; and
5. that the creditor sustained the alleged loss and damage as a proximate result of the representation having been made.

*Merchants Nat'l Bank of Winona v. Moen*, (*In re Moen*), 238 B.R. 785, 790 (B.A.P. 8th

---

[5] According to First National, the "Indebtedness" to which it refers is the amount of unpaid principal, interest, and other charges due to First National as of March 26, 2013, pursuant to the terms of the May 4, 2009 Promissory Note.

Cir. 1999)(quoting *Thul v. Ophaug*, 827 F.2d 340 (8th Cir. 1987)).

On May 4, 2009, Melon executed a promissory note in the amount of $348,918.98 in favor of First National. On the same day, Melon granted to First National a security interest in a 2004 Newell Coach. Subsequent to this exchange, Melon and First National executed two collateral exchanges: on July 7, 2009, First National obtained a security interest in a 2006 Coach in exchange for its security interest in the 2004 Newell Coach; and on December 20, 2010, First National obtained a security interest in a 2008 Travel Supreme in exchange for its security interest in the 2006 Coach. Neither of those exchanges involved the extension of new credit nor altered the terms of the debtor-creditor relationship that was established under the May 4, 2009 Promissory Note. *See Aslakson v. Freese* (*In re Freese*), 472 B.R. 907, 918 (Bankr. D.N.D. 2012) ("Misrepresentations made subsequent to the creation of the debt 'have no effect upon the dischargeability of a debt, since the false representation could not have been the creditor's reason for the extension of credit.'" quoting *Wilcoxon Constr., Inc. v. Woodall* (*In re Woodall*), 177 B.R. 517, 524 (Bankr. D. Md. 1995)); *Northern State Bank of Va. v. Hames* (*In re Hames*), 53 B.R. 868, 873 (Bankr. D. Minn. 1985) (debtor's misrepresentation on subsequent security agreement resulted in bank taking additional, valueless security for pre-existing debt); *but see Collum v. Redden* (*In re Redden*), 243 B.R. 623, 628 (Bankr. D. Del. 2000) (*rev'd on other grounds*, *Collum v. Redden*, No. CIV.A.00-503 GMS, 2002 WL 475179 (D. Del. Mar. 26, 2002)) ("The substitution of collateral and changes in the terms of a financial obligation constitute a refinance.").

The code defines "debt" as a liability on a claim. 11 U.S.C. § 101(12). A "claim" means a right to payment. 11 U.S.C. § 101(5). Melon's liability on First National's right to payment arose on May 4, 2009, when he executed the promissory note in the amount of $348,918.98 in favor of First National, not when he executed subsequent security agreements to enable collateral exchanges. Accordingly, the Court finds that the debt under which First National brings its § 523(a)(2)(A) action was incurred on May 4, 2009. The collateral exchanges that occurred on July 7, 2009, and December 20, 2010, did not

induce First National to loan Melon money or provide for the extension, renewal, or refinancing of the previously obtained credit.

In this instance, First National introduced evidence in support of its claim for relief under § 523(a)(2)(A) that only related to Melon's purported intent when he executed the December 20, 2010 security agreement and the events surrounding that transaction. First National did not introduce one scintilla of evidence relating to Melon's purported intent when he executed the promissory note on May 4, 2009. Ergo, the Court finds that First National has failed to meet its burden of proving any of the elements under § 523(a)(2)(A) relating to the debt incurred by Melon on May 4, 2009, and denies First National's § 523(a)(2)(A) cause of action.

**11 U.S.C. § 523(a)(6)**

Section 523(a)(6) states that "[a] discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt . . . (6) for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The Eighth Circuit requires that the debt be both a willful injury *and* a malicious injury. *Blocker v. Patch* (*In re Patch*), 526 F.3d 1176, 1180 (8th Cir. 2008); *Barclays Am./Bus. Credit v. Long* (*In re Long*), 774 F.2d 875, 881 (8th Cir. 1985). The Supreme Court has found that the word "willful" modifies injury; thus, in order to find that a willful injury occurred, there must be a deliberate or intentional injury, not merely a deliberate or intentional act that caused an injury. *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). The Eighth Circuit stated that the "willful" element is a subjective one that requires proof "that the debtor desired to bring about the injury or was, in fact, substantially certain that his conduct would result in the injury that occurred." *In re Patch*, 526 F.3d at 1180-81 (citing *Geiger v. Kawaauhau* (*In re Geiger*), 113 F.3d 848, 852-54 (8th Cir. 1997) (en banc)).

To find a willful injury, the Court must be able to identify the resultant harm that occurred from that injury. In this instance, the Court is able to identify certain acts that

had the potential to injure First National but is not able to identify a specific, related injury that occurred as a result of those acts, much less an injury that Melon either desired to bring about or that he would have been substantially certain would have occurred. The acts that had the potential for injury include the following events:

> 1. On December 29, 2010, when Melon delivered the title to the Travel Supreme to Decatur State Bank, Melon may have breached his contract with First National by violating paragraph 3 of the December 20, 2010 security interest. In paragraph 3, Melon had agreed that he would not permit any liens or security interests other than First National's to attach to the Travel Supreme. *See supra*, n.1. However, that alleged breach did not result in any harm to First National because Decatur Bank released its lien on the Travel Supreme on March 24, 2011.[6]
>
> 2. On April 7, 2011, Melon again breached his contract with First National when Melon executed a Floorplan Advance Request with GSB that placed the Travel Supreme under the blanket lien of GSB. This action was also in contravention of paragraph 3 of the December 20, 2010 security agreement. However, the evidence does not support a finding by the Court that Melon either desired to bring about an injury or that he would have been substantially certain that an injury would have occurred by his actions.
>
> 3. Finally, on May 11, 2011, Melon executed a replacement security agreement to replace "THE PREVIOUS SECURITY AGREEMENT DATED 5/04/2009 to reflect LEF [Lien Entry Filing] dated 5/11/11"–the December 20, 2010 security agreement. (Ex. 40.) In the May 11, 2011 security agreement, also in paragraph 3, Melon represented to First National that the Travel Supreme was free of encumbrances when, in fact, Melon had pledged the Travel Supreme to GSB approximately one month earlier through the Floorplan Advance Request.

In the third example, when Melon executed the replacement security agreement with First National, it is likely that he knew he was having financial difficulty with GSB at that time. In fact, less than two weeks after executing the replacement security agreement with First National, GSB repossessed all of its collateral from the GME lot in Springdale, including the Travel Supreme. Even if the Court found that when Melon

---

[6] The Court refers to this as an "alleged" breach because Melon testified that he had previously advised First National of his agreement with Decatur State Bank when the security interest was executed. After Melon testified to this alleged prior agreement with First National, First National did not call a rebuttal witness to contradict his testimony even though First National's bank president had previously testified that it would not have swapped the collateral if it had known about the Decatur transfer.

executed the agreement, he was aware of his financial condition and his apparent default with GSB, there is no evidence before the Court that established a value on all of GSB's collateral that was subject to repossession. Although Melon may have been aware of the potential default and possible repossession, he may also have believed there was sufficient, additional collateral to cover GSB's blanket lien. Also, in addition to other reasons, Melon contended that the Travel Supreme was not part of the inventory that was subject to repossession because it was titled in his individual name, not the name of his business. Therefore, the Court must conclude that Melon was not "substantially certain that his conduct would result in the injury that occurred."

The only identifiable injury of which the Court is certain is the repossession of the Travel Supreme by GSB that occurred on May 24, 2011, and resulted in the eventual sale of the Travel Supreme to McGaugh RV. However, the Court cannot find that Melon "desired to bring about the injury or was, in fact, substantially certain that his conduct would result in the injury that occurred" when he precipitated any of the transactions listed above. Accordingly, the Court finds that First National has failed to prove the first element of § 523(a)(6).

The second element requires the finding of a malicious injury. Referring specifically to transfers in breach of security agreements, the Eighth Circuit has held that a malicious injury requires conduct that is "targeted at the creditor ('malicious'), at least in the sense that the conduct is certain or almost certain to cause financial harm." *Barclays Am./Bus. Credit v. Long* (*In re Long*), 774 F.2d 875, 881 (8th Cir. 1985). In this instance, even if Melon was substantially certain that his conduct would have resulted in First National losing its collateral, there is no evidence before the Court that Melon's actions were targeted at First National. Melon testified that even after the Travel Supreme was repossessed by GSB, he continued to make sporadic payments to First National and told First National the Travel Supreme was in Florida. His reason for not telling First National about the repossession was that he thought he would be able to get GSB to release the Travel Supreme when GSB realized the RV was titled in his personal name

and not in the name of his company. Based on the evidence before the Court, the Court finds that Melon did not target First National specifically when he executed the false May 11, 2011 security agreement. Because First National has not met its burden of proof concerning the first and second elements of § 523(a)(6), the Court denies First National's § 523(a)(6) cause of action.

**CONCLUSION**

Based upon the record in this case and construing the provisions of § 523(a)(2)(A) and (a)(6) strictly, the Court finds that First National has failed to prove its case under either § 523(a)(2)(A) or (a)(6) by a preponderance of the evidence and, accordingly, denies the relief requested in First National's complaint.

**IT IS SO ORDERED.**

Ben Barry
United States Bankruptcy Judge
Dated: 02/20/2014

cc: Stanley V. Bond and Erin Curry, attorneys for Melon
John P. Seidenberger and Thomas J. McGeady, attorneys for First National Bank